## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

CROWN CASTLE FIBER LLC,

                Plaintiff,

    v.

CITY and COUNTY OF DENVER,

                Defendant.

## COMPLAINT

For its Complaint against Defendant City and County of Denver ("Denver" or "City"), Plaintiff Crown Castle Fiber LLC ("Crown Castle"), by its undersigned counsel, alleges, upon knowledge as to its own actions and upon information and belief as to all other matters, as follows:

### NATURE OF THE ACTION

This case involves Denver's telecommunication regulations surrounding the deployment of small wireless facilities in the public right of way. Denver's rules and requirements impose significant and unnecessary cost increases on Crown Castle, limit Crown Castle from deploying its own network, dictate and limit the telecommunications technologies that Crown Castle can deploy, and, ultimately, materially inhibit Crown Castle from providing service to multiple customers. Essentially, the City's requirements grant the exclusive ability to deploy small wireless facilities infrastructure to a single entity, Xcel Energy. Yet, the City does not have authority to

regulate the rates, terms, and conditions of access to Xcel Energy's poles, and, even if it did, such regulations would not save the City's requirements from preemption under the federal Communications Act.  The City's attempt to dictate the deployment of small wireless facilities imposes a regulatory scheme that has the effect of prohibiting Crown Castle from providing telecommunications services and its customers from providing personal wireless services, in violation of Section 253 of the federal Communications Act, 47 U.S.C. § 253.  Additionally, the City's requirements violate Colorado law by effectively prohibiting Crown Castle from providing telecommunications services, imposing unreasonable requirements on entry to the public rights of way, and discriminating against Crown Castle in its ability to deploy facilities in the public rights of way.

## PARTIES

1.      Plaintiff Crown Castle is a limited liability company organized under the laws of the state of New York, with its principal place of business at 1220 Augusta Drive, Houston, TX 77057.  Crown Castle provides telecommunications service in Colorado pursuant to a Certificate of Public Convenience and Necessity issued on October 17, 2018 (as corrected on October 23, 2018) by the Public Utilities Commission for the State of Colorado.  A copy of Crown Castle's Certificate of Public Convenience and Necessity is attached hereto as **Exhibit A**.

2.      Defendant City and County of Denver is a municipal corporation of the State of Colorado, possessing all general powers granted by the Constitution and laws of the State to such municipal corporations (hereinafter "Denver" or "City").

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because of the existence of a federal question arising under the Communications Act of 1934, as amended by the Telecommunications Act of 1996 (the "Communications Act").  This Court has authority to issue declaratory judgment relief pursuant to 28 U.S.C. § 2201(a).

4.      The Court has supplemental jurisdiction over Crown Castle's claims under Colorado law pursuant to 28 U.S.C. § 1367 because the Colorado claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to this action occurred in Colorado.

## FEDERAL TELECOMMUNICATIONS LAW

6.      In 1996, Congress amended the federal Communications Act of 1934 by enacting the Telecommunications Act of 1996 ("1996 Act").  The 1996 Act was expansive legislation intended to increase and improve competition in the telecommunications industry.  An important purpose of the 1996 Act was to "accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition . . . ."  H.R.  Conf.  Rep. No. 458, 104th Cong., 2d Sess. 1 (1996).

7.      When it enacted the 1996 Act, Congress considered the potential conflict between state and local government regulation of the public rights of way, and the national need for deployment of advanced telecommunications and information technologies.  Accordingly, the 1996 Act created Section 253 of the Communications Act, which prohibits local entities from

3

erecting barriers that may prohibit or have the effect of prohibiting the ability of any entity to provide telecommunications services, including taking actions or inactions that result in an unreasonable delay in the deployment of the provider's facilities and provision of telecommunications services.  47 U.S.C. § 253(a).

8.      In 2018, the Federal Communications Commission ("FCC") addressed how courts should determine when a local government action or requirement violates the effective prohibition clause of Section 253.  The FCC declared that under Section 253 "an effective prohibition [of service] occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service."  *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd 9088, ¶ 37, 2018 WL 4678555 (2018) ("*Declaratory Ruling*").  The FCC clarified that "a state or local legal requirement could materially inhibit service in numerous ways – not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services."  *Id*.  The Court of Appeals for the Ninth Circuit has affirmed the *Declaratory Ruling*, in relevant part.  *City of Portland v. U.S.*, 969 F.3d 1020 (9th Cir. 2020).

9.      In its 2018 *Declaratory Ruling*, the FCC reiterated that "a state or local requirement can function as an effective prohibition either because of the resulting financial burden in an absolute sense, or, independently because of a resulting competitive disparity."  *Id*. at ¶ 39.

10.      As the FCC explained, "consistent with both Commission and judicial precedent recognizing the prohibitory effect that results from a competitor being treated materially

differently than similarly-situated providers, . . . [a] regulatory structure that gives an advantage to particular services or facilities has a prohibitory effect, even if there are no express barriers to entry in the state or local code." *Id*.

11.     The FCC reasoned that "[S]tate or local legal requirements such as fees that impose a 'financial burden' on providers can be effectively prohibitive." *Id*. at ¶ 57.  In discussing how increased and excessive fees and costs can result in an effective prohibition, the FCC clarified that a local government's fee regime violates Section 253 unless: "(1) [the] fees are a reasonable approximation of the state or local government's cost, (2) only objectively reasonable costs are factored into those fees, and (3) [the] fees are no higher than the fees charged to similarly-situated competitors in similar situations." *Id.* at ¶ 50.

12.     However, the FCC's analysis of the potentially prohibitive nature of fees is not limited to fees.  *Id*. at ¶ 81 ("There are also other types of state and local land-use or zoning requirements that may restrict Small Wireless deployments to the degree that they have the effect of prohibiting service in violation of Sections 253 and 332…").

13.     The FCC's determination that "a state or local legal requirement constitutes an effective prohibition if it materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment … applies equally to fees and non-fee legal requirements." *Id*. at ¶ 82.

14.     Per the FCC's *Declaratory Ruling*, compliance with requirements that impose costs on providers that have an "impact on their ability to provide service," such as "a minimum spacing requirement that has the effect of materially inhibiting wireless service," would be considered an effective prohibition of service.  *Id*. at ¶ 87.

15.     The FCC has also previously clarified that "section 253(a) bars state or local requirements that restrict the means or facilities through which a party is able to provide service" and that "no state or local requirement may prohibit or have the effect of prohibiting any entity from providing any offering of telecommunications directly to the public for a fee regardless of the facilities used."  *In the Matter of The Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, 14 FCC Rcd 21697, 1999 FCC LEXIS 6558 at ¶ 21 (1996) ("*Minnesota Declaratory Ruling*").

16.     Even a rule that appears neutral can violate Section 253.  For example, in the *Minnesota Declaratory Ruling*, the state of Minnesota awarded one entity exclusive physical access to the state rights-of-way.  In exchange, it required that entity, through an Agreement, to let any other provider lease or purchase fiber optic lines from the exclusive rights holder on non-discriminatory rates, and to charge unaffiliated and affiliated parties the same rates for collocation. *Id*. at ¶¶ 5-7.  Nonetheless, the FCC found that the agreement violated Section 253 of the Act because it prohibited or had the effect of prohibiting the ability of any entity to provide any telecommunications service.  *Id.* at ¶ 11.  The FCC rejected Minnesota's claims that the agreement did not have such an effect based on the fact that the selected entity was not itself a provider of telecommunications services.  *Id*. at ¶ 13.

17.     The FCC found that the Agreement in *Minnesota* violated section 253 because it "may have the effect of prohibiting facilities-based entry" based on the fact that, even though alternative rights-of-way were available to other providers of telecommunications services, "utilizing rights-of-way other than the freeway rights-of-way to install telecommunications

infrastructure is substantially more expensive than using the freeway rights-of-way." *Id.* at ¶¶ 22. The FCC held that it was "more costly and time-consuming to obtain permission to use [alternative] rights-of-way than to obtain permission to use the [state rights-of-way to which Minnesota had granted one entity exclusive access]." *Id.* at ¶ 27. And Minnesota failed to convince the FCC that the cost differential would be insubstantial. *Id.* at ¶ 32. The FCC also noted that "utilities are potential competitors who may not want to share their rights-of-way with other telecommunications providers." *Id.* at ¶ 24.

18.   As set forth below, the City has adopted regulations and requirements governing the deployment of small wireless facilities in the public rights of way that have the effect of prohibiting Crown Castle from providing telecommunications services. As set forth below, the City's requirements impose significant and unnecessary cost increases on Crown Castle, materially inhibit or limit Crown Castle from deploying its own network, dictate and limit the telecommunications technologies that Crown Castle can deploy, and, ultimately, materially inhibit or limit Crown Castle from providing service to multiple customers. Fundamentally, the City's requirements, like the situation struck down by the FCC in the *Minnesota Declaratory Ruling*, effectively seek to grant the exclusive ability to deploy small wireless facilities infrastructure to a single entity, the local electric company, Xcel Energy but, in this case, the City does not even have authority to impose controls on Xcel Energy like those found inadequate by the FCC in the *Minnesota* case. The result is a regulatory scheme that has the effect of prohibiting Crown Castle from providing telecommunications services and its customers from providing personal wireless services, in violation of Section 253.

## COLORADO LAW GOVERNING THE DEPLOYMENT OF
## TELECOMMUNICATIONS NETWORKS

19.     Colorado law also addresses the deployment of telecommunications facilities, recognizing that the deployment of telecommunications networks, including small wireless facilities, is a statewide concern and specifically adopting provisions designed to facilitate the ability of entities, such as Crown Castle, to deploy their facilities and services.

20.     Colorado repeatedly has stated that telecommunications is fundamentally important to the state and a matter of state-wide concern.  *See* C.R.S. § 29-27-101.  The Colorado legislature also recognized that companies need to the able construct the infrastructure necessary for those telecommunications services, including small cell facilities, and that "(a) *Small cell facilities often may be deployed most effectively in the public rights-of-way*" and that "(b) [a]ccess to local government structures is essential to the construction and maintenance of wireless service facilities or broadband facilities."  C.R.S. § 29-27-401 (emphasis added).

21.     Section 40-15-502(7) of Colorado Revised Statutes likewise states that "[i]t is the policy of this state that all barriers to entry into the provision of telecommunications services in Colorado be removed as soon as practicable, subject to the commission's authority to ensure quality of service and other matters as provided in this article." C.R.S. § 40-15-502(7).  Colorado House Bill 17-1193, enacted in 2017, added provisions specifically addressing the deployment of small wireless facilities, such as those Crown Castle deploys, and limiting the authority of local governments over such deployments.

22.     Section 29-27-404(3) provides that "[t]he siting, mounting, placement, construction, and operation of a small cell facility or a small cell network is a permitted use by right in any zone."  C.R.S. § 29-27-404(3).

8

23.     Similarly, Article 5.5 of Title 38 of the Colorado Revised Statutes, which governs occupation of public rights of way by telecommunications providers, sets forth the Legislature's findings about the importance of telecommunications network deployment.  Section 38-5.5-101 provides, in pertinent part:

> **(1)**  The general assembly hereby finds, determines, and declares that:
>
> **(a)**  The passage of House Bill 95-1335, enacted at the first regular session of the sixtieth general assembly, ***established a policy within the state to encourage competition among the various telecommunications providers, to reduce the barriers to entry for those providers***, to authorize and encourage competition within the local exchange telecommunications market, and to ensure that all consumers benefit from such competition and expansion.
>
> **(b)**  The stated goals of House Bill 95-1335 were that all citizens have access to a wider range of telecommunications services at rates that are reasonably comparable within the state, that basic service be available and affordable to all citizens, and that universal access to advanced telecommunications services would be available to all consumers. ***Such goals are essential to the economic and social well-being of the citizens of Colorado and can be accomplished only if telecommunications providers are allowed to develop ubiquitous, seamless, statewide telecommunications networks***. ***To require telecommunications companies to seek authority from every political subdivision within the state to conduct business is unreasonable, impractical, and unduly burdensome***. In addition, the general assembly further finds and declares that since the public rights-of-way are dedicated to and held on a nonproprietary basis in trust for the use of the public, ***their use by telecommunications companies is consistent with such policy and appropriate for the public good***.

C.R.S. § 38-5.5-101(1) (emphasis added).

24.     Section 38-5.5-101(2) also reserves to political subdivisions their police powers with respect to telecommunications providers, but subject to that reservation, further finds and declares that:

> **(a)**     The construction, maintenance, operation, oversight, and regulation of telecommunications providers and their facilities ***is a matter of statewide concern and interest***;

**(b)**  Telecommunications providers operating under the authority of the federal communications commission or the Colorado public utilities commission pursuant to article 15 of title 40, C.R.S., require no additional authorization or franchise by any municipality or other political subdivision of the state to conduct business within a given geographic area and that no such political subdivision has jurisdiction to regulate telecommunications providers based upon the content, nature, or type of telecommunications service or signal they provide except to the extent granted by federal or state legislation;

**(c)**  *Telecommunications providers have a right to occupy and utilize the public rights-of-way for the efficient conduct of their business*;

**(d)**  Access to rights-of-way and oversight of that access must be competitively neutral, and no telecommunications provider should enjoy any competitive advantage or suffer a competitive disadvantage by virtue of a selective or discriminatory exercise of the police power by a local government.

C.R.S. § 38-5.5-101(2) (emphasis added).

25.     Section 38-5.5-103(1) likewise states that any telecommunications or broadband provider "*has the right to construct*, maintain, and operate conduit, cable, switches, and related appurtenances and facilities, and communications and broadband facilities, *including small cell facilities* and small cell networks, along, across, upon, above, and under any public highway in this state, subject to this article 5.5 and article 1.5 of title 9," and recognizes that the "construction, maintenance, operation, and regulation of the facilities described in subsection (1)(a) of this section, including the right to occupy and utilize the public rights-of-way, by telecommunications providers and broadband providers *are matters of statewide concern*."  C.R.S. § 38-5.5-103(1) (emphasis added).

26.     Section 38-5.5-103(2) limits the authority of local governments, stating that "[a] political subdivision shall not discriminate among or grant a preference to competing telecommunications providers or broadband providers in the issuance of permits or the passage of

10

any ordinance for the use of its rights-of-way, nor create or erect any unreasonable requirements for entry to the rights-of-way for the providers." C.R.S. § 38-5.5-103(2).

27.    Section 38-5.5-106(1) also preserves some role for a political subdivision of the State, providing that a telecommunications provider or broadband provider must obtain consent from a local government before deploying facilities in the public rights of way. C.R.S. § 38-5.5-106(1). However, Section 38-5.5-106(2)(a) limits the local government's authority, stating that the consent of the political subdivision "shall be based upon a lawful exercise of its police power and shall not be unreasonably withheld." C.R.S. § 38-5.5-106(2)(a).

28.    Section 38-5.5-106(2)(b) further addresses and limits the authority of political subdivisions of the State, providing that "[a] political subdivision shall not create any preference or disadvantage through the granting or withholding of its consent." C.R.S. § 38-5.5-106(2)(b). Under Section 38-5.5-106(2)(b) "[a] political subdivision shall not create any preference or disadvantage through the granting or withholding of its consent." C.R.S. § 38-5.5-106(2)(b). Although the statute provides that "[a] political subdivision's decision that a vertical structure in the right-of-way, including a vertical structure owned by a municipality, lacks space or load capacity for communications or broadband facilities, or that the number of additional vertical structures in the rights-of-way should be reasonably limited . . . does not create a preference for or disadvantage any telecommunications provider or broadband provider," the political subdivision may only limit a telecommunications provider from installing a vertical structure if the limit is "consistent with protection of public health, safety, and welfare" and not if the decision limiting the installation of a new vertical structure "[has] the effect of prohibiting a provider's ability to provide service within the service area of the proposed facility." C.R.S. § 38-5.5-106(2)(b).

## CROWN CASTLE'S TELECOMMUNICATIONS SERVICE

29.     Crown Castle provides telecommunications services, as that term is defined by the Communications Act of 1934, as amended, 47 U.S.C. § 153(53). Crown Castle's telecommunications service consists of providing transport of Crown Castle's customers' communications (both voice and data) between points designated by the customer without alteration of the content of the communications.

30.     Crown Castle installs and operates telecommunications facilities to provide telecommunications service.

31.     Crown Castle provides a variety of telecommunications services. In this case, using the network and facilities it seeks to deploy in the City, Crown Castle seeks to provide telecommunications service to wireless carriers by deploying small cell devices. Crown Castle's wireless carrier-customers then would use those small cell devices to provide personal wireless services, including 5G technologies. Crown Castle calls the telecommunications service it provides to wireless carriers "radio frequency transport service" ("RF Transport"). Crown Castle's RF Transport customers are often providers of retail wireless telecommunications services (also known as Commercial Mobile Radio Services ("CMRS") providers, cellular, or Personal Communications Services ("PCS") providers).

32.     In addition to providing telecommunications service to wireless carriers, Crown Castle also offers and provides other types of telecommunications services to other types of customers.

33.     Crown Castle's RF Transport service offering involves a communication signal handed off from Crown Castle's customer to Crown Castle that Crown Castle then transports over

its fiber optic facilities.   This handoff and transport takes place at and through equipment configurations called "Nodes" that are located on utility or street light poles located in the public rights of way.

34.     The nodes Crown Castle has deployed and the nodes Crown Castle seeks to deploy in Denver are "small wireless facilities" as that term is defined by federal law.  47 C.F.R. § 1.6002(l).

35.     The typical Node in Crown Castle's network consists of electronic equipment that converts Radio Frequency (*i.e.*, "RF" or wireless) format communications to light signals carried over Crown Castle's fiber optic lines.  The equipment comprising a typical Node in Crown Castle's network includes a small, low-power antenna, laser, and amplifier equipment for the conversion of RF signals to optical signals (or from optical to RF).  Those items are connected to the antenna, fiber optic lines, and associated equipment (such as power supplies).

36.     Upon handoff from its customer, Crown Castle transports communications through Crown Castle's fiber optic network to a distant point called a "Hub."  The Hub is a central location that contains such equipment as routers, switches, and signal conversion equipment.  Crown Castle hands the communication signal back to its customer at the Hub, where the communications signal is interconnected with the public telephone network.  The telecommunications transport also goes from the Hub to the Node.

37.     Although some of Crown Castle's service and network incorporates wireless reception devices, Crown Castle is not a wireless or commercial mobile radio service ("CMRS") provider.

38.     All of the wireless transmissions are controlled and made by Crown Castle's customers, who control and are responsible for their licensed spectrum.

39.     Fundamental to Crown Castle's status as a provider of telecommunications services is that it offers its services to multiple potential customers.  Accordingly, the facilities that it deploys must be capable of accommodating and serving multiple wireless carrier-customers.

## THE CITY'S RULES REGARDING DEPLOYMENT OF SMALL WIRELESS FACILITIES

40.     In May 2019, the City revised its rules regarding the deployment of small wireless facilities in the public rights of way in a document entitled City and County of Denver Small Cell Infrastructure Design Guidelines.  A copy of the City's Small Cell Infrastructure Design Guidelines is attached hereto as **Exhibit B**.

41.     The City's Small Cell Infrastructure Design Guidelines impose complex and limiting regulations on the deployment of small wireless facilities in the public rights of way in the City.

42.     Among other things, the Small Cell Infrastructure Design Guidelines impose differing standards and limits for different types of small wireless facility deployments.  The Small Cell Infrastructure Design Guidelines refer to deployment of small wireless facilities on existing wood utility poles as "Type 1" installations.   The Small Cell Infrastructure Design Guidelines define Type 2 installations as attachment of small wireless facilities on wooden street light poles. The Small Cell Infrastructure Design Guidelines define Type 3 installations as small wireless facilities that are replacing an existing street light pole with a combination small cell and metal street light pole.  The Small Cell Infrastructure Design Guidelines define as "Type 4" a category it refers to as "freestanding small cell infrastructure."    The Type 4 freestanding small cell

14

infrastructure is only allowed to accommodate the equipment of a single wireless carrier.  If multiple wireless carriers are to be accommodated, the Small Cell Infrastructure Design Guidelines define that as a "Type 6" "multi-carrier" pole.

43.     Also, the provisions of the Small Cell Infrastructure Design Guidelines serve to limit the equipment that can be deployed on the different Types of poles and the locations of the various types of poles.

44.     For example, Section 6.3 of the Small Cell Infrastructure Design Guidelines governs the placement of "Type 4" poles (*i.e.* single-carrier freestanding poles).  In relevant part, Section 6.3 provides that:

> If there is a suitable streetlight within 250 feet of the proposed freestanding small cell, the streetlight must be strongly considered for deployment at an existing streetlight location (Type 3 combination pole).  Otherwise, a freestanding Type 4 small cell pole shall:
> ■ Not be located within 25 feet of an existing Xcel Energy or CCD owned streetlight pole.
> . . .
> ■ ***Not be closer than 250 feet away, radially, from another privately owned Type 4 freestanding small cell***.

Exhibit B, page 31 (emphasis added).

45.     Likewise, Section 8.3 of the Small Cell Infrastructure Design Guidelines governs Type 6 (multicarrier stand-alone poles).  It provides that

> Type 6 pole placement shall consider the following, along with the placement criteria listed in Section 2.2.
> . . .
> ■ ***No closer than 250 feet away, radially, from another privately owned Type 4 or Type 6 freestanding small cell***.
> ■ ***Shall not be located in residential neighborhoods unless uniquely presented to CCD for approval with thorough rationale for deviating from this requirement***.

Exhibit B, page 41 (emphasis added).

46.     Xcel Energy is the local electric utility that owns both utility poles and street light poles in the public rights of way in Denver.

47.     Thus, Section 8.3 of the Small Cell Infrastructure Design Guidelines prohibits Crown Castle from installing a small wireless facility that is capable of serving multiple wireless carrier-customers (what the City would call a Type 6 pole) on a pole own by Crown Castle within 250 feet of an existing Xcel Energy pole – even if the existing Xcel Energy pole is "Type 4" and therefore can only accommodate one wireless carrier.

48.     Section 8.3 of the Small Cell Infrastructure Design Guidelines also prohibits Crown Castle from deploying a pole capable of serving multiple wireless carrier-customers in any residential neighborhood.  Section 8.3 provides that a multi-carrier pole is only allowed in a residential neighborhood if "uniquely presented to [the City] for approval with thorough rationale for deviating from this requirement," but identifies no process for seeking such approval and no standard that the request must meet or that will govern the City's evaluation.

49.     The Small Cell Infrastructure Design Guidelines also impose a requirement dictating the technical standard for the foundation of the various Types of poles that will support a small wireless facility.  Although the Small Cell Infrastructure Design Guidelines do not address the foundation or installation of wooden poles (which the Guidelines call Type 1 and Type 2), the Small Cell Infrastructure Design Guidelines do dictate cast concrete foundations for Type 4 and Type 6 poles (*i.e.*, non-wooden poles).  Exhibit B at 30, 41.

50.     Prior to the adoption of the May 2019 Small Cell Infrastructure Design Guidelines, the City Engineer had approved Crown Castle's installation of small wireless facility support poles

using a "direct embed" method (where the pole is directly embedded into the ground) rather than a cast concrete (or "caisson") foundation.

51.    The cast concrete foundation requirement in the Small Cell Infrastructure Design Guidelines is significantly more costly and time consuming.

52.    Installation of small wireless facilities support poles by Crown Castle using the direct embed method is safe and consistent with generally applicable engineering standards.

53.    Crown Castle has installed small wireless facility support poles in multiple locations in Colorado safely.

54.    The cast concrete foundation requirement in the Small Cell Infrastructure Design Guidelines is not necessary, conflicts with the City Engineer's prior approvals, and is unreasonable.

55.    The requirements, limitations, and standards in the Small Cell Infrastructure Design Guidelines have the effect of prohibiting the provision of telecommunications services, including personal wireless services.

### CROWN CASTLE'S PROPOSED FACILITIES DEPLOYMENT IN DENVER

56.    In Denver, Crown Castle seeks to deploy approximately 131 small wireless facility Nodes in the public rights of way.

57.    To deploy its Nodes, Crown Castle must use poles in the public rights of way to support the Node equipment.

58.    Under Section 224 of the federal Communications Act, 47 U.S.C. § 224, electric utility companies that own "utility poles" are required to give Crown Castle access to those poles

on just and reasonable rates, terms, and conditions.  The rates, terms, and conditions of access to utility poles in Colorado is regulated by the FCC.  47 C.F.R. § 1.1401 *et seq.*

59.     As noted above, Xcel Energy is the electric utility that owns both utility poles and street light poles in the public rights of way in Denver.  Xcel Energy has deployed wooden utility poles in some of the public rights of way in Denver.

60.     In certain areas of Denver, Xcel Energy has not deployed wooden utility poles, but has only deployed street light poles.

61.     Xcel Energy takes the position that street light poles owned by Xcel Energy are not subject to 47 U.S.C. § 224 or the FCC's regulations.

62.     Crown Castle and Xcel Energy have entered into an agreement governing the rates, terms, and conditions on Crown Castle's ability to access Xcel Energy street light poles in Denver ("Street Light Pole Agreement").

63.     Although, as discussed above, the City's Small Cell Infrastructure Design Guidelines force the use of Xcel Energy poles, Xcel Energy's street light poles in Denver are generally not capable of accommodating Crown Castle's small wireless facility equipment.  As a result, for Crown Castle to use an existing Xcel Energy street light pole, the pole must be removed and replaced with a new pole that can accommodate the additional equipment.  The replacement pole may be taller or stronger than the original, or both, and may be configured to accommodate small wireless facilities.

64.     The Street Light Pole Agreement requires Crown Castle to pay for replacement of Xcel Energy street light poles, requires that Crown Castle pay the full cost of the replacement pole and all replacement costs, including but not limited to costs for installation of the replacement

pole, for transfer of all items from the existing to the replacement street light pole, for removal of the existing pole, and for the remaining depreciated value of the existing pole. Despite paying all of those costs, payment of such costs does not provide Crown Castle with any ownership interest in the replaced pole.

65.     In the Street Light Pole Agreement, Xcel Energy also imposes specifications that severely limit the size and number of Crown Castle's attachments.

66.     As discussed above, part of Crown Castle's business model as a provider of telecommunications services is to provide service to multiple wireless carrier-customers through a shared network. For Crown Castle to be able to provide service to more than one wireless carrier-customer on a pole at a specific location, Crown Castle must install more equipment than is required to serve only a single wireless carrier-customer.

67.     The Xcel Energy specifications in the Street Light Pole Agreement effectively prevent Crown Castle from installing the equipment that Crown Castle would install to serve multiple wireless carrier customers on a single Xcel Energy street light pole.

68.     Xcel Energy also currently will not install a pole that would qualify as the "Type 6" multicarrier pole required by the City's Small Cell Infrastructure Design Guidelines.

69.     If the City's requirements did not exist, Crown Castle would install a pole of its own in the public rights of way rather than use Xcel Energy street light poles. This would allow Crown Castle to deploy its network in Denver and serve multiple wireless carrier-customers through a shared network. Crown Castle has deployed its own poles in the public rights of way.

70.     When Crown Castle deploys its own support poles, the poles can be designed to mimic surrounding street light poles in the area.

19

71.     When Crown Castle deploys its own support poles, the poles are made to accommodate equipment to allow Crown Castle to serve multiple wireless carrier-customers.

72.     When Crown Castle deploys its own support poles, Crown Castle has control over the cost of deployment and also the configuration of the equipment.

73.     When Crown Castle deploys small wireless facility Nodes, the service it provides to wireless carrier-customers supports those wireless carriers' provision of personal wireless services, as that term is defined in 47 U.S.C. § 332(c)(7)(C)(i).

74.     The effective coverage area of one of Crown Castle's Nodes is a radius of approximately 300 feet, depending on the conditions and surroundings.  Items such as buildings and trees interfere with the transmission of radio signals and can decrease the coverage distance. Accordingly, the specific location of each Node is carefully identified based on multiple parameters, including the other wireless facilities in potential wireless carrier-customers' networks, and, as a result, the Nodes cannot easily be moved or changed without significantly impacting the other Nodes in Crown Castle's network as well as the other facilities in Crown Castle's wireless carrier-customers' networks.

75.     In addition, as a result of the limited coverage range, the Nodes cannot be located too far apart or a gap in service will result.

76.     The limited range of Crown Castle's Nodes, and similar small wireless facilities, in addition to being the function of the technology, serves a purpose.  Historically, deployment of wireless networks provided wider coverage, but had limited capacity (capacity being the ability to provide more people service and accommodate greater use of the limited wireless bandwidth). Crown Castle's Nodes are part of a critical deployment of facilities to increase the coverage and

capacity of existing wireless networks.  This deployment is often referred to as the "densification" of wireless networks, and it is necessary to the provision of personal wireless services by Crown Castle's wireless carrier-customers.

## CROWN CASTLE'S ATTEMPTS TO DEPLOY TELECOMMUNICATIONS FACILITIES IN DENVER

77.     Crown Castle has, on numerous occasions, attempted to deploy wireless facilities in Denver, including under the current version of the Small Cell Infrastructure Design Guidelines.

78.     In more than one case, the City has denied Crown Castle's applications to install its own poles, even though the proposed facility was not within 250 feet of a potential Xcel Energy pole, on grounds that the proposed facility would not be constructed using precast concrete, or "caisson" foundation, and would instead be constructed using direct embed foundation.

79.     Crown Castle has current plans to deploy approximately 131 small wireless facility Nodes in the City.  If allowed, Crown Castle would install those 131 small wireless facility Nodes on new poles owned by Crown Castle.

80.     The City has already rejected 50 of the 131 potential small wireless facility Node locations based on the existence of Xcel poles in the area.

81.     On information and belief, a majority of Crown Castle's planned small wireless facility Nodes would be subject to the requirement to use an Xcel Energy pole because the planned Node would be within 250 feet of an Xcel Energy pole.

82.     Crown Castle also may serve multiple wireless carrier-customers on each of its planned Nodes.

83.     As set forth below, although Crown Castle has in the past deployed facilities on some Xcel Energy poles, due to the significantly increased costs imposed as discussed in this

Complaint, the delays, and the technical limitations on the ability to serve multiple customers from the same installation, it is not feasible for Crown Castle to use Xcel Energy poles as required by the City's Small Cell Infrastructure Design Guidelines.

84.     On information and belief, the City has allowed at least one other telecommunications provider to install, maintain, and operate new poles to support small wireless facilities without complying with, and in conflict with, the City's Small Cell Infrastructure Design Guidelines, including but not limited to the prohibition on installing new poles within 250 feet of an existing Xcel Energy or City-owned pole.

### THE CITY'S REQUIREMENT TO USE XCEL ENERGY'S POLES IS NOT TECHNOLOGICALLY FEASIBLE

85.     As discussed above, the rules enacted and enforced by the City in the Small Cell Infrastructure Design Guidelines force Crown Castle to use Xcel Energy utility poles.  This is because, per the City's Design Guidelines, Crown Castle may not place poles within 250 feet, radially, from any privately owned pole, including Xcel Energy or City-owned poles.

86.     In some parts of Denver, Xcel Energy poles are located less than 500 feet apart from each other, so there is nowhere that a pole can be installed that is at least 250 feet radially from either Xcel Energy pole.

87.     The 250-foot distance requirement is both arbitrary and not technologically feasible.

88.     As discussed above, the service coverage area of small wireless facilities is only approximately 300 feet, and coverage areas must overlap substantially to provide seamless wireless service as users of wireless devices move throughout Denver.

22

Case 1:21-cv-01070-STV   Document 1   Filed 04/16/21   USDC Colorado   Page 23 of 35

89.     The City's requirement to use an existing Xcel Energy pole is not reasonable because it is not technically feasible.

90.     The City's prohibition on Crown Castle installing a Crown Castle-owned multi-carrier pole within 250 feet of an existing Xcel Energy Pole is dictating the technology and design of Crown Castle's network and the technology and design of its wireless carrier-customers' networks, effectively prohibiting services.

## XCEL ENERGY'S POLES CANNOT ACCOMMODATE MULTIPLE CARRIERS

91.     As set forth above, Xcel Energy's standards effectively prohibit Crown Castle from serving multiple wireless carriers using an Xcel Energy street light pole, particularly in light of the City's Small Cell Infrastructure Design Guidelines.

92.     Among other things, the inability to serve multiple carriers significantly reduces the number of customers Crown Castle can recover its costs from, making it infeasible to recover the costs of building its network in Denver.

93.     Crown Castle is capable of deploying its own pole that is capable of accommodating multiple carrier customers.

94.     If it is allowed to serve multiple wireless carrier-customers on a single pole, Crown Castle's deployment also would benefit the public by reducing the number of poles that would be required if each carrier had to be on a separate pole.

## THE COST OF REPLACING XCEL ENERGY'S POLES IS PROHIBITIVE

95.     Xcel Energy's existing poles, other than a small number of wooden utility poles, which the City does not allow to be used as a permanent small wireless facility support, are not engineered to hold small wireless equipment.  However, Crown Castle is prohibited by the City's

23

Small Cell Infrastructure Design Guidelines from building its own poles within 250 feet radially of an existing Xcel Energy pole.  Thus, in most parts of Denver, because the existing Xcel Energy poles are not capable of accommodating Crown Castle equipment, Crown Castle, at its expense, must replace and reengineer the Xcel Energy poles.

96.     Crown Castle has undertaken to replace Xcel Energy street light poles in Denver. The cost for Crown Castle to replace an Xcel Energy pole in Denver is approximately $35,000 to $45,000 per pole.

97.     In addition, after paying to replace the Xcel Energy street light pole, Crown Castle would still have to pay an annual rental fee to Xcel Energy for access to these reengineered Xcel Energy poles.

98.     Crown Castle can deploy its own poles at a cost of approximately $26,000 per pole on average, and each pole is capable of accommodating multiple wireless carrier-customers.

99.     Crown Castle has proposed that it be permitted to perform pole work itself when it can do so at a cost that is 10% or more lower than the cost of having Xcel perform the work.  Xcel has rejected that proposal.

100.     Thus, the City's Small Cell Infrastructure Design Guidelines force Crown Castle to pay from $9,000-$19,000 more per pole as compared to deploying its own poles.

101.     Crown Castle has plans to deploy at least 100 more Nodes in Denver.  Thus, the additional cost of being forced to use Xcel Energy street light poles will impose on Crown Castle approximately $900,000 to $2,000,000 more than if it were permitted to deploy its own poles.

102.     The significant increase in cost of deploying Crown Castle's network created by the City's requirement that Crown Castle use Xcel Energy poles materially inhibits Crown Castle

24

from competing in a fair and balanced regulatory environment, and, as a result, has the effect of prohibiting Crown Castle from providing telecommunications services.

103.    A significant cause of the increase in cost of deployment – both when replacing an Xcel Energy pole and if Crown Castle is allowed to install its own pole -- is the requirement in the City's Small Cell Infrastructure Design Guidelines for a costly cast concrete "caisson" foundation.

104.    Crown Castle has previously installed poles using a more affordable, but equally safe "direct embed" foundation.

105.    Crown Castle's direct embed foundation meets all safety and structural requirements, including wind loading.

106.    From an engineering standpoint, the caisson foundation is unnecessary and imposes an undue cost.

107.    The City Engineer has already permitted Crown Castle to build poles with direct embed – not caisson – foundation on three occasions.  And Crown Castle has safely installed poles using direct embed foundation elsewhere.

108.    The foundation type dictated by the Small Cell Infrastructure Design Guidelines is significantly more costly, takes longer to install, and requires more maintenance when temperatures drop.

109.    In addition to the direct cost imposed on Crown Castle to pay for replacement of Xcel Energy poles – which cannot be used to serve multiple wireless carrier-customers – forcing Crown Castle to use Xcel Energy poles also materially inhibits Crown Castle's ability to provide service because the process of having Xcel Energy replace its poles takes significantly longer than if Crown Castle were permitted to install its own poles in the public rights of way.

110.    Crown Castle has proposed that Crown Castle's access to Xcel's poles be subject to specific, reasonable timelines that are imposed on access to wooden utility poles under Federal Communications Commission rules.  Xcel refused to agree to have access to Xcel's street light poles be subject to those timelines for access.

111.    The City has effectively removed Crown Castle's option to deploy its own facilities, resulting in a significant cost increase, significant delay in the time for deployment, and an effective prohibition on the ability to service multiple carrier-customers, and in so doing it has effectively prohibited the provision of telecommunications services.

112.    The City has required Crown Castle to use Xcel Energy poles and has erected costly barriers to entry by imposing costly, unnecessary, and arbitrary restrictions on its facilities that operate as an effective prohibition on Crown Castle's ability to provide telecommunications services.

113.    In addition to the significant cost increase, by requiring Crown Castle to use Xcel Energy street light poles, the City is effectively preventing Crown Castle from serving multiple wireless carrier-customers, and, as such, is effectively prohibiting it from providing telecommunications services.

## COUNT I
### The City's Rules, As Applied, Violate the Communications Act (47 U.S.C. § 253)

114.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 113 above.

115.    Pursuant to 47 U.S.C. § 253(a) "[n]o state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."

26

116.    In its 2018 *Declaratory Ruling*, the FCC definitively interpreted the "effective prohibition" language of Section 253(a) of the Communications Act. *In re Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd 9088, 2018 WL 4678555 (2018).

117.    Among other things, the *Declaratory Ruling* made clear that "requirements that impose costs on providers" that "impact their ability to provide service" are considered an effective prohibition of service. *Id*. at ¶ 87.

118.    Where a regulation results in a "substantial financial investment" that would effectively preclude entry, it constitutes an effective prohibition in violation of section 253(a). *In the Matter of The Petition of the State of Minnesota for a Declaratory Ruling Regarding the Effect of Section 253 on an Agreement to Install Fiber Optic Wholesale Transport Capacity in State Freeway Rights-of-Way*, 14 FCC Rcd. 21697; 1999 FCC LEXIS 6558 at ¶ 21 (1996).

119.    Additionally, "section 253(a) bars state or local requirements that restrict the means or facilities through which a party is able to provide service. . . . no state or local requirement may prohibit or have the effect of prohibiting any entity from providing any offering of telecommunications directly to the public for a fee regardless of the facilities used." *Id*.

120.    In the *Declaratory Ruling*, the FCC emphasized that the impact of increased costs on telecommunications providers by local requirements must be considered in the aggregate, including across geographic regions, because even if a single requirement may not, alone, have a prohibitory effect, when the requirements are viewed in the aggregate, they have the effect of prohibiting service in violation of Section 253. *Decl. Ruling* ¶¶ 60-62.

121.    The City's requirements, as applied, have the effect of prohibiting Crown Castle from providing telecommunications service and of prohibiting the provision of personal wireless service by Crown Castle's customers in violation of 47 U.S.C. § 253 as interpreted and applied by the FCC, the Tenth Circuit, and other courts.

122.    As set forth above, by requiring the use of Xcel Energy poles and by requiring unreasonable building standards, the City's requirements significantly increase the cost to Crown Castle of deploying its facilities and providing service, to the point of effectively prohibiting the provision of telecommunications services in violation of 47 U.S.C. § 253.

123.    As set forth above, the City's requirements, by prohibiting Crown Castle from installing its own poles within 250 feet of an existing Xcel Energy pole and by prohibiting the installation of a small wireless facility within 250 feet of any other existing small wireless facility, prevent Crown Castle from deploying its own facilities to provide telecommunications services, including but not limited to, by dictating technology and network design.  The City's requirements are not reasonable, in that they are not technically feasible, and thereby effectively prohibit Crown Castle from providing telecommunications services and effectively prohibiting the provision of personal wireless service by Crown Castle's customers in violation of 47 U.S.C. § 253.

124.    In addition, to the extent that the City's requirements also effectively limit the number of wireless carrier-customers that Crown Castle can serve, they effectively prohibit Crown Castle from providing telecommunications services and effectively prohibit the provision of personal wireless service by Crown Castle's customers in violation of 47 U.S.C. § 253.

125.    Furthermore, the City's requirements prohibit Crown Castle from deploying a multi-carrier small wireless facility in a residential neighborhood, absent approval by the City

28

pursuant to an undefined process, with no defined standards, and in excess of the City's authority to evaluate. As a result, the City's requirements have the effect of prohibiting Crown Castle from providing telecommunications services and effectively prohibiting the provision of personal wireless service by Crown Castle's customers in violation of 47 U.S.C. § 253.

126.     The City's requirements set forth in the Small Cell Infrastructure Design Guidelines are not reasonable management of the public rights of way imposed in a competitively neutral and nondiscriminatory manner under 47 U.S.C. § 253(c).

127.     Crown Castle will suffer irreparable harm from the application of the City's Small Cell Infrastructure Design Guidelines.

**COUNT II**
**The City's Rules, As Applied, Violate Colorado Law (C.R.S. § 38-5.5-103)**

128.     Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 127 above.

129.     Colorado law repeatedly has recognized that the deployment of telecommunications facilities, including small wireless facilities, is a matter of statewide concern, C.R.S. §§ 29-27-101(2)(a), 29-27-401(1)(c), 38-5.5-101(2)(a), and that local government regulations of telecommunications networks and services "impact persons living outside the municipality," C.R.S. § 29-27-101(2)(b). The Colorado Legislature has explicitly recognized that the State's goals of allowing all consumers access to a wide range of telecommunications services "are essential to the economic and social well-being of the citizens of Colorado and can be accomplished only if telecommunications providers are allowed to develop ubiquitous, seamless, statewide telecommunications networks. To require telecommunications companies to seek

authority from every political subdivision within the state to conduct business is unreasonable, impractical, and unduly burdensome." C.R.S. § 38-5.5-101(1)(b).

130.    Colorado law grants telecommunications providers the right to occupy and utilize the public rights-of-way for the installation, operation, and maintenance of their telecommunications facilities, including small wireless facilities. C.R.S §§ 38-5.5-101(2)(c), 38-5.5-103(1).

131.    Crown Castle is a telecommunications provider under Colorado law.

132.    Under C.R.S. § 38-5.5-103(2) "[a] political subdivision shall not discriminate among or grant a preference to competing telecommunications providers or broadband providers in the issuance of permits or the passage of any ordinance for the use of its rights-of-way, nor create or erect any unreasonable requirements for entry to the rights-of-way for the providers." C.R.S. § 38-5.5-103(2).

133.    Although a telecommunications provider may not install telecommunications facilities, including new poles, without first obtaining the consent of the political subdivision, under C.R.S. § 38-5.5-106(2)(a) the consent of the political subdivision "shall be based upon a lawful exercise of its police power and shall not be unreasonably withheld." C.R.S. § 38-5.5-106(2)(a).

134.    Moreover, under Section 38-5.5-106(2)(b) "[a] political subdivision shall not create any preference or disadvantage through the granting or withholding of its consent." C.R.S. § 38-5.5-106(2)(b). Although the statute provides that "[a] political subdivision's decision that a vertical structure in the right-of-way, including a vertical structure owned by a municipality, lacks space or load capacity for communications or broadband facilities, or that the number of additional

30

vertical structures in the rights-of-way should be reasonably limited . . . does not create a preference for or disadvantage any telecommunications provider or broadband provider," the political subdivision may only limit a telecommunications provider from installing a vertical structure if the limit is "consistent with protection of public health, safety, and welfare" and not if the decision limiting the installation of a new vertical structure "[has] the effect of prohibiting a provider's ability to provide service within the service area of the proposed facility." C.R.S. § 38-5.5-106(2)(b).

135.    As set forth above, the City's requirements, by prohibiting Crown Castle from installing its own poles within 250 feet of an existing Xcel Energy pole and by prohibiting the installation of a small wireless facility within 250 feet of any other existing small wireless facility, prevent Crown Castle from deploying its own facilities to provide telecommunications services, including but not limited to, by dictating technology and network design. The City's requirements are not reasonable, in that they are not technically feasible, and thereby effectively prohibit Crown Castle from providing telecommunications services and are unreasonable requirements for entry to the public rights of way in violation of C.R.S. § 38-5.5-103(2).

136.    In addition, to the extent that the City's requirements also effectively limit the number of wireless carrier-customers that Crown Castle can serve, they are unreasonable requirements for entry to the public rights of way in violation of C.R.S. § 38-5.5-103(2).

137.    Furthermore, the City's requirements prohibit Crown Castle from deploying a multi-carrier small wireless facility in a residential neighborhood, absent approval by the City pursuant to an undefined process, with no defined standards, and in excess of the City's authority

to evaluate.  As a result, the City's requirements are unreasonable requirements for entry to the public rights of way in violation of C.R.S. § 38-5.5-103(2).

138.    The City's requirements discussed above erect unreasonable requirements for entry to the rights of way by Crown Castle in violation of C.R.S. § 38-5.5-103(2).

139.    In addition, the City's requirements discussed above discriminate against Crown Castle and disadvantage Crown Castle in violation of C.R.S. § 38-5.5-103(2).

140.    Crown Castle will suffer irreparable harm from the application of the City's Small Cell Infrastructure Design Guidelines.

## COUNT III
### The City's Rules, As Applied, Violate Colorado Law (C.R.S. § 38-5.5-106)

141.    Plaintiff incorporates herein by reference the allegations of paragraphs 1 through 140 above.

142.    The City's requirements, as applied, have the effect of prohibiting Crown Castle from providing telecommunications service in violation of C.R.S. § 38-5.5-106(2)(b).

143.    The City's requirements, as applied, unreasonably withhold consent for Crown Castle to occupy the public rights of way in violation of C.R.S. § 38-5.5-106(2)(a).

144.    As set forth above, by requiring the use of Xcel Energy poles and by requiring unreasonable building standards, the City's requirements significantly increase the cost to Crown Castle of deploying its facilities and providing service to the point of unreasonably withholding consent for Crown Castle to occupy the public rights of way in violation of C.R.S. §§ 38-5.5-106(2)(a), 38-5.5-106(2)(b).

145.    As set forth above, by requiring the use of Xcel Energy poles and by requiring unreasonable building standards, the City's requirements significantly increase the cost to Crown

32

Castle of deploying its facilities and providing service to the point of effectively prohibiting the provision of telecommunications services in violation of C.R.S. § 38-5.5-106(2)(b).

146.     As recognized by the Colorado legislature, the significant increase in cost imposed by the City's requirements is a statewide interest that will have adverse impacts beyond the City by adversely impacting Crown Castle's ability to deploy in other localities in Colorado.

147.     As set forth above, the City's requirements, by prohibiting Crown Castle from installing its own poles within 250 feet of an existing Xcel Energy pole and by prohibiting the installation of a small wireless facility within 250 feet of any other existing small wireless facility, prevent Crown Castle from deploying its own facilities to provide telecommunications services, including but not limited to, by dictating technology and network design.  The City's requirements are not reasonable, in that they are not technically feasible, and thereby effectively prohibit Crown Castle from providing telecommunications services and unreasonably withhold consent for Crown Castle to occupy the public rights of way in violation of C.R.S. §§ 38-5.5-106(2)(a), 38-5.5-106(2)(b).

148.     In addition, to the extent that the City's requirements also effectively limit the number of wireless carrier-customers that Crown Castle can serve, they effectively prohibit Crown Castle from providing telecommunications services and unreasonably withhold consent for Crown Castle to occupy the public rights of way in violation of C.R.S. §§ 38-5.5-106(2)(a), 38-5.5-106(2)(b).

149.     In addition, the City's requirements discussed above discriminate against Crown Castle and disadvantage Crown Castle in violation of C.R.S. § 38-5.5-106(2)(b).

4813-2044-9254.1

150.    Crown Castle will suffer irreparable harm from the application of the City's Small Cell Infrastructure Design Guidelines.

**WHEREFORE**, Plaintiff demands judgment in its favor and that this Court enter:

(a) A declaration that the City's Small Cell Infrastructure Guidelines violate and are preempted by 47 U.S.C. § 253;

(b) A declaration and judgment that the City's Small Cell Infrastructure Guidelines effectively prohibit Crown Castle from providing telecommunications service and are in violation of and preempted by 47 U.S.C. § 253(a).

(c) A declaration that the City's Small Cell Infrastructure Guidelines violate C.R.S. § 38-5.5-103 and are therefore void and unenforceable;

(d) A declaration that the City's Small Cell Infrastructure Guidelines violate C.R.S. § 38-5.5-106 and are therefore void and unenforceable;

(e) A declaration and judgment that the City's Small Cell Infrastructure Guidelines effectively prohibit Crown Castle from providing telecommunications service and are in violation of C.R.S. § 38-5.5-106 and are therefore void and unenforceable;

(f) A declaration and judgment that the City's Small Cell Infrastructure Guidelines impose unreasonable requirements on entry to the public rights of way for a telecommunications provider in violation of  C.R.S. § 38-5.5-103 and are therefore void and unenforceable.

(g) An order prohibiting the City from enforcing on Crown Castle the City's Small Cell Infrastructure Guidelines to the extent declared unlawful by the Court.

4813-2044-9254.1

(h)  An order awarding Crown Castle its costs, reasonable attorneys' fees and other

expenses incurred in this action; and

(i)  Such other and further relief as the Court deems just and proper.


Dated: April 16, 2021.

Thomas Scott Thompson
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
POPEO, P.C.
701 Pennsylvania Avenue NW, Suite
900 Washington, DC 20004
Tel: 202-434-7440
E-mail: SThompson@Mintz.com


*s/Ellie Lockwood*
Michael E. Lindsay
Ellie Lockwood
SNELL & WILMER L.L.P.
1200 Seventeenth Street, Suite 1900
Denver, CO 80202
Telephone: 303-634-2000
Facsimile:  303-634-2020
E-mail: mlindsay@swlaw.com;
elockwood@swlaw.com


*Attorneys for Plaintiff*